THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
MICHAEL J. STERN (Cal. Bar No. 194342)
Assistant United States Attorney
Narcotics Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3898
    Facsimile: (213) 894-0142
    michael.stern@usdoj.gov

Attorney for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. CR 06-466-DDP |
| | ) |
| Plaintiff, | ) GOVERNMENT'S CONSOLIDATED |
| | ) OPPOSITION TO WIRETAP |
| v. | ) SUPPRESSION MOTION FILED BY |
| | ) DEFENDANT JAMAR GREER AND |
| JAMAR GREER, et al. | ) JOINDER BY DEON LOPEZ; |
| | ) MEMORANDUM OF POINTS AND |
| Defendants. | ) AUTHORITIES |
| | ) |
| | ) Date: May 19, 2008 |
| | ) Time: 3:00 p.m. |

The government respectfully files this opposition to the wiretap suppression

motion filed by defendant Jamar Greer and the joinder filed by defendant Deon

Lopez.  This opposition is based upon the attached memorandum of points and

authorities, the files and records in this case, and any evidence introduced at any

hearing on this motion, although the government does not believe that an

evidentiary hearing is necessary or appropriate.

Dated: May 2, 2008                    Respectfully submitted,

                                      THOMAS P. O'BRIEN
                                      United States Attorney

                                      CHRISTINE C. EWELL
                                      Assistant United States Attorney
                                      Chief, Criminal Division


                                      MICHAEL L STERN
                                      Assistant United States Attorney
                                      Narcotics Section

                                      Attorneys for Plaintiff
                                      United States of America

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Jamar Greer, Defendant, is charged in an indictment with violating federal drug and conspiracy laws.  During the investigative stages of this case, the government sought authorization from the district court for the use of wiretaps. Beginning on February 16, 2005, the government presented a series of applications for authorization to intercept wire communications to United States District Judge George P. Schiavelli.  After reviewing each of the wiretap applications, and concluding that they established probable cause and necessity, Judge Schiavelli signed orders authorizing the use of wiretaps.

During the course of the investigation, the wiretaps uncovered a network of people involved in the distribution of large amounts of cocaine.  The cocaine was obtained from a Southern California distributor named Mauro Galindo. Defendant, and other members of the conspiracy, would repackage the cocaine obtained from Galindo and ship it to the Midwest United States for further distribution.  Approximately 44 pounds of cocaine was seized from members of the drug trafficking organization.

In March 2005, co-conspirators Deon Lopez and Duane Palm received

3

approximately 30 pounds of cocaine from Galindo. They received the cocaine on a "front" and owed Galindo more than $200,000 for the cocaine. Based on information from the wiretap, law enforcement officers succeeded in seizing this cocaine. Rather than repaying Galindo for the cocaine that was seized by law enforcement, several members of the organization decided to murder Galindo.

On March 31, 2005, members of the organization of which Greer was a part murdered Galindo. The organization members also shot Galindo's wife in an effort to murder her as well. Galindo's wife used her body to cover her two children that were in the car with her at the time of the shooting. The two children were not injured.

## II.

## <u>CHALLENGE TO THE WIRETAP</u>

Defendant has filed a motion seeking suppression of the evidence obtained as a result of the use of the wiretaps in this matter. Defendant's motion is based on three allegations. First, Defendant asserts that the original wiretap application was not properly authorized by a valid order from the Attorney General. Second, Defendant asserts that Judge Schiavelli made an error in referring to two dates in the interim reports that he reviewed. Finally, Defendant asserts that Judge Schiavelli abused his discretion in determining that the wiretap affidavit satisfied

4

the necessity requirement.  The government will respond to each of these allegations in the order they were presented in Defendant's motion to suppress.

### Attorney General Authorization

Defendant asserts that the original wiretap is defective because it was not supported by the statutorily required authorization from the Attorney General. Defendant is incorrect.

The application for the wiretap in the instant case was supported by an authorization from Attorney General John Ashcroft which was embodied in his order designated as "Order No. 2407-2001."  This order was signed by the Attorney General in 2001 and was in effect at the time the wiretap application was filed.  (BS 744-45).[1]  The 2001 Ashcroft order designated authority to several officials within the Department of Justice, including any Deputy Assistant Attorney General, to sign the memorandum which authorizes the U.S. Attorney's Office to file an application for a wiretap with a judge in its district.  In this case, Deputy Assistant Attorney General John Keeney signed the memorandum authorizing the application for the wiretap.  (BS 747) .

---

[1]   Defendant has attached copies of the relevant wiretap applications, affidavits, and orders.  These materials are bate-stamped with sequential numbers on the lower right corner of each page.  The government will refer to the bate-stamped page number with the abbreviation "BS."

5

Initially, Defendant asserts that the government should not have been able to rely on the 2001 Ashcroft Order because Attorney General Ashcroft's authority expired on February 3, 2005, when he resigned as Attorney General of the United States.  (Defendant's brief at 9).[2]  Defendant then claims that the resignation of Attorney General Ashcroft served to immediately nullify all orders he signed during his tenure as Attorney General.  So, according to Defendant, this voided John Keeney's authorization of the original wiretap in this matter because Keeney's power to authorize wiretaps was based on the 2001 Ashcroft order.  Aside from making this assertion, Defendant has cited no authority to support his position that the resignation of an Attorney General serves to void all orders issued during his tenure.  In fact, case law supports the opposite conclusion.

In United States v. Edmond, 718 F. Supp. 988, 991 (D.C. Cir. 1989), the court addressed this issue and stated: "The fact that Richard and Keeney were operating pursuant to an Order issued by departed Attorney General Meese in no way vitiates their authority.  The clear weight of the case law supports this proposition, and the defendants tilt at windmills by arguing otherwise."  Several other cases stand for the same proposition; the resignation of the Attorney General

---

[2]    Defendant also asserts that Attorney General John Ashcroft's authority expired on February 5, 2005. (Defendant's brief at 5-6).  Defendant offers no support for either assertion.

6

does not preclude reliance on orders that were signed by the Attorney General prior to his resignation. In United States v. Lawson, 780 F.2d 535, 539 (6th Cir. 1985) the court held that the authorization order signed by Attorney General Civiletti in 1981 permitted an Assistant Attorney General under Attorney General Smith to approve a wiretap application in 1983. See also: U.S. v. Anderson, 39 F.3d 331 (D.C. Cir. 1994) ("[T]he usual rule [is] that administrative orders ordinarily remain in effect beyond the tenure of the individual who issued them."); United States v. Kerr, 711 F.2d 149, 151 (10th Cir.1983); United States v. Terry, 702 F.2d 299, 311 (2d Cir.1983); United States v. Messersmith, 692 F.2d 1315, 1316-17 (11th Cir. 1982); United States v. Wyder, 674 F.2d 224, 226-27 (4th Cir. 1982); United States v. Todisco, 667 F.2d 255, 259 (2d Cir. 1981). Consequently, no violation of policy or law occurred when Deputy Assistant Attorney General Keeney authorized the government to apply for the wiretap in this case.

Defendant also asserts that an impropriety occurred during the 30 day monitoring period of the original wiretap. According to Defendant, this occurred when one Attorney General substituted his authorization order for that of the prior Attorney General. The original wiretap in this matter was applied for on February 16, 2005, and was authorized by the district court on February 18, 2005. (BS 743, 733). After the original wiretap was authorized by the district court, the new

7

Attorney General, who was confirmed two weeks earlier, revoked the authorization order of the previous Attorney General and issued an authorization order of his own.   This order, designated "Order No. 2758-2005," was signed on February 24, 2005, and was effective February 25, 2005.  (BS 873).[3]

In this claim, Defendant does not challenge the propriety of the government's original application or the authorization that supported the application.  This application was supported by the 2001 Ashcroft order which was in effect at the time the application was filed.  Instead, in this argument Defendant asserts that the government had a duty to notify the district court of the February 24, 2005, order by the new Attorney General which revoked the authorization order of the prior Attorney General.  The February 24, 2005, revocation order came during the 30 day interception period of the original wiretap.

Defendant's argument, that the government was under an obligation to notify the authorizing judge about the change in the Attorney General order, is premised on the statutory requirements which control applications for wiretaps.  These requirements are set forth in 18 U.S.C. § 2516, which states in pertinent

---

[3]   Defendant incorrectly states that this order was effective March 25, 2005. (Defendant's brief at 6).

8

part:

> The Attorney General, Deputy Attorney General,
> Associate Attorney General, or any Assistant Attorney
> General, or any Deputy Assistant Attorney General or
> acting Deputy Assistant Attorney General in the
> Criminal Division specially designated by the Attorney
> General, may authorize an application to a Federal judge
> of competent jurisdiction for [a wiretap.]

At the time the application for the original wiretap was filed, it was

supported by a valid order from the Attorney General. The fact that the order was

revoked and replaced by a new order during the course of the 30 day interception

period is of no consequence. This is so because the requirements of 18 U.S.C. §

2516 relate, by their own terms, only to the application for the wiretap. Changes

in the authorization order that are made after the application to the district court

have no effect on the validity of the application. Once the application is properly

made, the government has satisfied its obligation under 18 U.S.C.§ 2516.

Defendant has cited no support for his novel position to the contrary and the

government is aware of none.[4]

---

[4]   The government offers the same response to Defendant's argument that it
should have brought the substituted authorization order to the district court's
attention in a 15 day report. The application was properly filed under the authority
of the Ashcroft Order and the later filing of an order by Attorney General

9

## **15 Day Reports**

Defendant next complains that two of the 15 day reports contain a typographical error and reference a court order that does not exist.[5]  Defendant is correct that there is a typographical error in two of the 15 day reports but this does not affect the validity of the wiretaps.

On March 7, 2005, the government filed a 15 day report that related to the original wiretap which was authorized by the court on February 18, 2005.  (BS 827-39).  The 15 day report recounted details of the intercepted calls during the first portion of the interception period.  At the end of the 15 day report, the

_____

Gonzalez had no effect on the propriety of the application.

The cases cited by Defendant in support of his argument are not sufficiently similar to the instant case to be relevant.  For instance, in <u>United States v. Reyna</u>, 218 F.3d 1108 (9th Cir. 2000), the government applied to the district court for authorization to initiate a wiretap before receiving authorization from the Attorney General or his designee.  The <u>Reyna</u> court found this to be improper because prior authorization is a prerequisite that must be satisfied before applying for a wiretap.  In the instant case, the government received the necessary authorization and attached the documents which supported that authorization to the application for a wiretap that was filed with the district court.

[5]    Interim reports, colloquially referred to as "15 day reports," typically contain summaries of a sampling of the wiretap calls that have been intercepted between the time the interception began and the filing of the report.  These reports are authorized by the wiretap statue but are not required by the statute.  18 U.S.C. §2518(6).  In fact, courts may "dispense[ ] with progress reports entirely."  <u>United States v. Iannelli</u>, 477 F.2d 999, 1002 (3rd Cir. 1973).

10

government included a paragraph which was entitled "Approval by Court." This paragraph included a reference to the date of the order which authorized the wiretap and concluded with a directive to continue the wiretap.[6]

In the "Approval by Court" paragraph, the government mistakenly listed the wrong date for the order that authorized the wiretap.   The date that was mistakenly listed had nothing to do with wiretap and was presumably a date that related to a different wiretap that was inadvertently left unchanged when the "go-by" 15 day report form was used to draft the report that was filed with the court. Several other locations in the same 15 day report listed the correct date on which the court's order authorizing the wiretap was signed.  (BS 827, 828, 838).   A similar typographical error occurred in the April 11, 2005, 15 day report.  (BS 972-85).

While the government does acknowledge the typographical error that Defendant has pointed out, the government disagrees with Defendant's position that the error requires suppression of the evidence derived from the wiretap.  The government's authority to intercept wire communications derives from the court's orders which were issued at the time the court received and reviewed the

---

[6]   Some 15 day reports do not include this paragraph and nothing in the wiretap statute requires that it be included.

11

government's wiretap applications. (BS 797-806, 938-48). The fact that the court signed something in a 15 day report which was intended to affirmatively direct the continuation of the wiretap cannot serve to do just the opposite and revoke the authorization. Each of the court's orders authorizing the wiretaps was for a period of 30 days. Nothing in the 15 day reports expressed any intention by the court to revoke or modify the 30 day order to intercept wire communications. Consequently, the court's orders, each of which allowed for 30 days of interception, remained unchanged and the government properly relied on those orders when it continued its interception for that period of time.

**Necessity**

In addition to establishing probable cause, in order to obtain authorization for a wiretap the government must demonstrate that normal investigative techniques have been tried and failed or reasonably appear unlikely to succeed or to be too dangerous. See 18 U.S.C. § 2518(3)(a), 18 U.S.C. § 2518(3)(c), and 18 U.S.C. § 2518(1)(c). This requirement is generally termed the "necessity" requirement. A district court's finding that there is necessity to justify a wiretap is reviewed under the abuse of discretion standard. United States v. Canales Gomez, 358 F.3d 1221, 1225 (9th Cir. 2004); United States v. Bennett, 219 F.3d 1117, 1121 (9th Cir. 2000). In fact, as the Ninth Circuit stated in United States v.

12

McGuire, 307 F.3d 1192, 1197 (9th Cir. 2002), "[t]he court authorizing a wiretap has <u>considerable</u> discretion." <u>Id.</u> (emphasis added).

Defendant asserts that Judge Schiavelli abused his discretion when he authorized the wiretap because the necessity requirement had not been met. He is wrong. The government will address each of Defendant's assertions regarding the necessity requirement in the same order they are presented in his motion to suppress. However, initially the government must note that Defendant's recounting of the list of evidence that was obtained as a result of traditional methods of investigation does not serve to diminish the need for a wiretap. The government does not dispute that traditional methods of investigation resulted in the collection of evidence. That evidence was described in the series of wiretap affidavits that were presented to Judge Schiavelli. Judge Schiavelli reviewed the affidavits and found that the government had satisfied both the probable cause and the necessity requirements.

**Prior Interceptions**

Defendant states that prior to the wiretap on Galindo's[7] telephone, wiretap

---

[7]    At the time of the wiretap, investigators did not know Galindo by his true name. He was referred to as "Viejon," a Spanish word meaning "old man." Evidence from the wiretap on Galindo's phone is what allowed the investigators to fully identify Galindo.

13

orders were authorized on the telephones of two co-conspirators, Cassillas and Aranda.  Defendant is correct in this assertion.  However, Defendant does not make clear why it is that he believes that wiretaps on the telephones of two co-conspirators negated the necessity that was demonstrated in the affidavit in support of the wiretap on Galindo's telephone.

Galindo was the drug supplier to Cassillas and Aranda.  That fact was evidenced by the calls between these two co-conspirators and Galindo.  However, as stated in the affidavit in support of the application for the wiretap on Galindo's telephone, the objectives of the investigation included much more than collecting additional evidence against Cassillas and Aranda.  The investigation sought to identify the key personnel in Galindo's drug trafficking organization.  (BS 766).  The investigation also sought to identify Galindo's drug suppliers, the location of his stash houses, the roles played by the people who were part of his organization, his methods of importing and distributing the drugs, and the disposition of his drug proceeds.  (BS 766-67).  This was not achieved through the wiretaps on the telephones of Cassillas and Aranda.  Because Cassillas and Aranda were drug purchasing customers of Galindo, it would not have been reasonable to expect that wiretapping their telephones would result in obtaining evidence regarding Galindo's other customers, or his suppliers, or his workers, or his stash houses, or

14

the disposition of his drug proceeds.  (BS 767-68).

Defendant also points out that there was a wiretap that was authorized on the telephone of co-conspirator Jimenez.  However, the affidavit in support of the Galindo wiretap brought this to the court's attention and noted that the only connection between the two was that toll records showed contact between Galindo and Jimenez. (BS 768).   The government explained that Jimenez had not yet been intercepted over his own wiretapped telephone line and that even if he had, calls between him and Galindo would not satisfy the goals of the investigation.  (BS 768).

The existence of wiretaps on a few of the telephones of Galindo's co-conspirators did not produce evidence that satisfied the goals of the investigation. All of these other wiretaps were brought to the attention of the judge who issued the wiretap on Galindo's telephone.  Defendant has failed to demonstrate how these other wiretaps precluded a finding of necessity and, more importantly, how the finding of necessity by the authorizing judge was an abuse of discretion.

**Confidential Informants**

Defendant also asserts that prior to applying for the wiretap in this case, the government had developed several confidential informants who had knowledge

15

about the drug trafficking activities of Cassilas and another co-conspirator, Benavides.  The government does not dispute this assertion.  We said as much in the affidavit in support of the application for the wiretap.  However, the goal of the investigation, as set forth in the affidavit, was not to develop prosecutable cases against Cassilas and Benavides.  The primary goal of the investigation was to develop a prosecutable case against Galindo and all the members of his organization.  So, the fact that there were confidential informants available who could assist in developing evidence against people other than the primary target of the investigation does not serve to extinguish a finding of necessity.

Defendant's attention to the detail that the government had access to a confidential informant who made contact with Benavides ignores the fact that Galindo, not Benavides, was the primary target of the investigation.  Considering that Defendant has offered nothing to call into question the portion of the affidavit which states that neither informant knew Galindo, it is unclear how he can credibly assert that the informants could have been used to identify Galindo's sources of supply, his stash locations, his workers, and what he does with his drug proceeds.  (BS 771-773).

Further, the informant that Defendant insists could have been used to access Galindo, via Benavides, had lost contact with Benavides and was probably not

16

trusted by Benavides because a former drug deal between the two did not work out. (BS 772). Even if the informant did have continued access to Benavides, this would not have resulted in satisfying the goals of the investigation as they related to Galindo. The informant was someone who purchased drugs from Benavides. There was little likelihood that Benavides would introduce his drug customer to Galindo, his drug supplier. Doing so would have undoubtedly resulted in Benavides being cut out of the sales equation. Also, the affidavit in support of the wiretap explained that large scale drug traffickers like Galindo insulate themselves by restricting information about their illegal activities to only those people that they trust and with whom they are very close. (BS 773-74). The informant was not such a person.

Finally, in relation to the use of informants, Defendant claims that the affidavit contains conclusory and speculative statements by the affiant, Federal Bureau of Investigation (FBI) Special Agent Craig Harris. What Defendant refers to as conclusory and speculative is actually the expert opinion of Agent Harris. At the outset of the affidavit, Agent Harris explained that he had been an FBI agent for more than eight years and that he had received substantial training and experience in the area of investigating drug trafficking crimes. (BS 748-50). It was based on this extensive training and experience that Agent Harris offered his

expertise in relation to how drug trafficking organizations work and the likelihood of success in the instant case through the use of different investigative techniques. So, what Defendant refers to as speculation is really the expert opinion of Agent Harris. Defendant's disagreement with the expert opinion of the investigating agent does not make the authorizing judge's decision to accept that opinion an abuse of discretion.

**Physical Surveillance**

Defendant contends that the physical surveillance that was conducted as part of the investigation was successful. The government does cannot dispute that the physical surveillance provided some information that was of value to the investigation. This was stated in the affidavit. (BS 776). However, the surveillances were conducted primarily on co-conspirators Cassillas and Aranda. The surveillances did not result in the investigating officers fully identifying Galindo or his residence.[8] More importantly, the surveillances did not result in satisfying the goals of the investigation as they related to Galindo. The

---

[8]   Considering Defendant's strenuous objection to what he characterizes as speculation on the part of the investigating agent, the government finds it ironic that Defendant exerts little self-restraint in his blatant speculation that "it was just a matter of time until law enforcement would have successfully followed [Galindo] to his residence." (Defendant's brief at 22).

surveillances did not reveal Galindo's source of supply, or his stash houses, or the employees of his organization, or what he did with his drug proceeds. As such, the surveillances did not obviate the need for the wiretap.

Further, the affidavit noted that the targets of the investigation were extremely cautious of being the subject of surveillance. They went to great lengths to determine whether they were being watched and caught the surveillance team on several occasions. On one of the intercepted telephone calls, Aranda told Casillas that he was being followed and then went on to accurately describe the surveillance team that was following him. (BS 775-76). When a target discovers that he is under surveillance, the investigation is jeopardized. (BS 780). As stated in the affidavit, use of the wiretap would allow the times, dates, and locations of the surveillances to be restricted to those occasions on which the agents believed that they would have success and not run the risk of needlessly jeopardizing the investigation. (BS 780-81).

**Financial Investigation**

Defendant complains that the investigating agent had no reason to state that reviewing the bank records of Galindo would not result in satisfying the goals of the investigation. First, this ignores the fact that the affidavit also states that bank

records could not be obtained because Galindo had not been fully identified. (BS 781). Bank records, tax returns, and credit reports could not be obtained for someone who had not been fully identified. Consequently, Defendant's argument regarding the potential value of these items is moot. Even if it were not moot, the affidavit points out that bank records will not result in identifying the source of a target's drug supply, the identification of all the people he buys drug from and sells drugs to, the methods he uses to sell the drugs, and where he stores his drugs. (BS 781-82). Again, this is not speculation. This assertion was based on the substantial training and experience of the investigating agent and Judge Schiavelli was entitled to rely on that expertise in issuing his order authorizing the wiretap.

### Search Warrants, Interviews, Grand Jury, Immunity, Trash Searches

With virtually no discussion, Defendant contests the investigating agent's conclusion that the goals of the investigation could not have been satisfied though the use of search warrants, interviews, grand jury inquiries, offers of immunity, and trash searches. Defendant cites United States v. Blackmon, 273 F.3d 1204 (9th Cir. 2001), in support of this claim. According to the Blackmon majority, the facts in Blackmon showed that "other than using trap and trace devices and pen registers, it appears that the government conducted no investigation targeted specifically at Blackmon." Id. at 1208.

20

As it relates to the use of informants, the majority opinion in <u>Blackmon</u> stated that the government had informants that had known Blackmon for more than 10 years and had grown up with him. One of the government's informants had personally observed Blackmon cooking cocaine. Other government informants "knew the sources of the narcotics and the locations where the narcotics were stored and had participated in numerous controlled purchases of narcotics from Blackmon."[9] <u>Id</u>. at 1209.

In sharp contrast to the circumstance described above in <u>Blackmon</u>, in the instant case the government did not have informants who had direct access to the main target of the investigation. The government had two informants who had a connection to some of Galindo's co-conspirators. Possible ways to use the informants were examined but because neither informant knew Galindo the informants were not able to be used in a way that would have satisfied the goals of the investigation.

In <u>Blackmon</u>, the investigating agents conducted no surveillance. However, in the instant case, agents conducted multiple surveillances between November

---

[9]   These facts were apparently not included in the Blackmon affidavit and, upon review by the Ninth Circuit, were classified as misstatements and omissions designed to "conceal the fact that the wiretap was not necessary." <u>Id</u>.

21

2004 and January 2005. (BS 776-81). Unfortunately, none of the surveillances resulted in evidence that came close to satisfying the goals of the investigation. In <u>Blackmon</u>, no search warrants were executed as part of the investigation and the agents knew where Blackmon lived. In Defendant's case, a search warrant was executed on a location connected to a co-conspirator but the search did not produce evidence that tied the co-conspirator, or Galindo, to the drugs that were found at the house. (BS 782). Because Galindo and his residence had not been fully identified, no search warrant or trash pull could be conducted at his residence. (BS 785).

The <u>Blackmon</u> majority was also critical of the generalized language used to justify necessity because when the misstatements and omissions were removed from the affidavit, all that remained were the generalized assertions that are applicable to all investigations. In sharp contrast to <u>Blackmon</u>, the affidavit in this case recounts specific efforts that were made to satisfy the goals of the investigation short of the use of a wiretap. Details about the confidential informants, the multiple surveillances, the search warrant, and the efforts to identify Galindo and find his residence are all included in the affidavit for the wiretap.

Regarding Defendant's assertion that the affidavit should not contain any

22

generalized language, <u>Blackmon</u> does not hold that agents may not use their expertise in describing how drug organizations work and what limitations they face when using traditional investigative tools.  Rather, <u>Blackmon</u> stands for the proposition that listing these general principles <u>alone</u> is insufficient to establish necessity.  When these principles are listed <u>in conjunction with</u> specific facts about the investigation for which the government is seeking a wiretap, they are appropriately considered by the judge who is reviewing the wiretap application. This is so because criminal organizations necessarily have characteristics that are common from one organization to the next.  Agents, prosecutors, and judges who have participated in the investigation, prosecution, and adjudication of drug organizations know this all too well.  It is not simply for the sake of convenience that agents include their expertise about drug organizations in wiretap affidavits. This evidence is borne out of the organizational design employed by drug traffickers in case after case that comes before state and federal courts in this district and others across the country.  Because the goals of these drug organizations are virtually identical -- to sell drugs and make money without being detected by law enforcement -- is should not come as a surprise to anyone that the techniques used to accomplish these goals are similar from one organization to another.  Law enforcement agents should not be discounted or discredited when

they describe a pattern of behavior that they see used by different organizations. After all, the drug traffickers are responsible for choosing how they operate. The law enforcement officers only articulate the pattern they see time and time again.

The Ninth Circuit has limited <u>Blackmon</u>'s holding to only those cases where an affidavit is found to be replete with material misstatements and omissions. <u>United States v. Fernandez</u>, 388 F.3d 1199, 1237 (9th Cir. 2004); <u>Canales Gomez</u>, 358 F.3d at 1225. Thus, to the extent that <u>Blackmon</u> can be read as being critical of general allegations which would be true in most narcotics investigations, such criticism can have no weight where the affidavit at issue is not replete with material misstatements and omissions. Because the affidavit in this case does not contain material misstatements and omissions, <u>Blackmon</u> is not applicable to the analysis of this case. Even if <u>Blackmon</u> were applicable, the affidavit in this case is rich with detail that is case specific and does not rely solely on the type of generalized allegations of necessity that drew the ire of the <u>Blackmon</u> majority.

24

## Pen Registers, Trap and Trace Devices, Toll Analysis, Subscriber Data

Defendant also offers little detail about why he believes that the use of pen registers and the like would have sufficed to satisfy the goals of this investigation. Instead, he simply asserts that the use of pen registers and other traditional investigative techniques would have "clearly" satisfied the goals of the investigation. This assertion is not true.

As discussed in detail in the affidavit which supported the government's application for a wiretap, pen registers and other traditional investigative techniques were used. However, the traditional techniques did not satisfy the goals of the investigation. In fact, the use of traditional techniques had not even resulted in the case agents being able to fully identify the main target. As noted above, throughout the affidavit Galindo was referred to as "Viejon" because the agents did not know his real name.

Considering that there were no informants that had access to Galindo, and multiple surveillances had not resulted in evidence that even fully identifed Galindo, the use of pen registers, trash pulls, toll analysis, and other traditional investigative techniques was not going to satisfy the goals of the investigation. Discovering the source of Galindo's drugs, all of his cohorts and their roles in the

organization, where he stored his drugs, how the drugs were distributed, all of his

customers, and what he did with the drug proceeds, was not going to happen

through the use of pen registers, or trash pulls, or any combination of traditional

investigative techniques.

## **Scope of the Investigation**

Defendant complains that the scope of the investigation, as set forth in the

government's affidavit, was too broad.  Specifically, Defendant claims that the

government's goals were intentionally over-broad so as to manufacture necessity.

Defendant is incorrect.

While it is true that the government's goals were lofty, they were not

unattainable and certainly not designed to manufacture necessity.  One example

provided by Defendant, which he asserts supports his position that the

government's goals were wholly unattainable, is the government's indication that

it wanted to use the wiretap to obtain information leading to the identity of

Defendant's drug supplier.  Defendant claims that this goal was unattainable

because Galindo would never reveal the names of his supplier in telephone

conversations with Benavides, Jimenez, Aranda, and Cassillas.  Defendant reasons

that revealing the names of his suppliers to the co-conspirators who purchased

drugs from Galindo would be against Galindo's self-interest and would prompt his customers to deal directly with his suppliers.  (Defendant's brief at 28).

The government agrees with Defendant's assessment that Galindo would not reveal the names of his suppliers to his customers because this would effectively result in "cutting [Galindo] out of the deals."  Id.   In fact, this reality supports the government's position that Benavides, Jimenez, Aranda, and Cassillas would not have known about Galindo's suppliers, stash houses, and other details of Galindo's operation outside of their direct dealings with Galindo. If Benavides, Jimenez, Aranda, and Cassillas did not have the pertinent information the government was looking for, it is not reasonable to believe that the two informants who were familiar with Benavides and Cassillas would have had access to the information through Benavides and Cassillas.  The informants certainly would not have known more than the people from whom they were believed to have received their information.  As a consequence, Defendant's assessment that drug traffickers like Galindo are very secretive in their dealings actually supports the government's position that a wiretap was necessary to obtain the information sought by the government.

Although the government agrees with Defendant that intercepting calls between Galindo and Benavides, Jimenez, Aranda, and Cassillas would not result

27

in the disclosure of Galindo's source of supply, we do not agree that intercepting

Galindo over the wiretap would not result in the disclosure of his supplier. While

Defendant would not tell his customers who his supplier was, it does not follow

that Defendant would not disclose this information in other ways – by talking to

other people, including his supplier. In order for a defendant to order drugs and

arrange to take delivery of drugs, he will inevitably use his telephone. It took no

stretch of the imagination to expect that Defendant would use his telephone to

negotiate drug transactions with his supplier. This belief was supported by the

fact that the investigating agents believed that Galindo's source of supply was in

Mexico and toll analysis showed that one of Galindo's target telephones had

repeated contact with four different telephone numbers in Mexico. (BS 765).

Similarly, it was reasonable to expect that other goals of the investigation

would be satisfied by information that would be revealed over the wiretap. For

instance, while Defendant's theory holds true that Galindo would not reveal the

identity of one customer to another over the wiretap, it does not follow that

Galindo would only talk to Benavides, Jimenez, Aranda, and Cassillas over the

wiretap. Instead, it was reasonable to conclude that if Galindo were willing to

conduct drug trafficking negotiations with Benavides, Jimenez, Aranda, and

Cassillas on his telephone, he would be willing to do the same with other

28

customers of his over the same telephone.  And he did.  It was through the use of the wiretap on Galindo's telephone that co-conspirators Duane Palm, Damion Thompson, Nastasha Friday, and Jesse Hayes were identified.  It was through the use of the wiretap that Defendant was identified.  So, not only were the goals of the investigation attainable, in many respects they were achieved.

The same can be said for the goal of learning the roles of the different co-conspirators and making drug seizures connected to the organization.  The wiretap did reveal the nature of how Galindo worked with many of his customers and how drugs were distributed between Galindo and his customers.  In fact, it was due to evidence obtained over the wiretap that surveillances were initiated which resulted in the seizure of 30 pounds of cocaine from co defendants Deon Lopez and Duane Palm.

Defendant also complains that the goals of the investigation "kept changing so as to justify the increasing number of interceptions." (Defendant's brief at 29). As mentioned by Defendant in his brief, Galindo was murdered during the course of the wiretap.  The murder was related to drug transactions Galindo had with some of his customers, including Duane Palm and Damion Thompson.  Galindo's wife was also shot during the events related to the murder.  So, it is true that some of the goals of the investigation were expanded to include obtaining evidence

against the people who were responsible for the murder.  The government refuses to acknowledge the cloud of impropriety Defendant attempts to cast over its efforts to develop a prosecutable case against a group of people who murdered a man and shot his wife in attempt to murder her as well.

In more general terms, the government does acknowledge that as time progressed and more drug traffickers were identified by evidence from the wiretap, the goals of the investigation changed.   While we acknowledge this as a fact, we dispute that there is anything wrong with its occurrence.  Investigations into large scale drug trafficking organizations are dynamic.  As more evidence is gathered, and more drug traffickers are revealed, the investigation expands.  An expanding investigation offers the government additional opportunities to take more drug traffickers off the streets.  The expansion of this investigation was driven not only by the desire to take ordinary drug traffickers off the streets but by the compelling motivation to take these particular drug traffickers off the streets. As the investigation developed, the case agents were acutely aware that the targets of the investigation were willing to further their drug trafficking activities by murdering a member of the organization as well as attempting to murder an innocent bystander to ensure that there would not be a witness to the murder.   The case agents' decision to expand their investigation into the illegal activities of an

organization responsible for a murder was not only reasonable, it was commendable. The members of this organization chose what crimes they would commit and how frequently they would commit them. The case agents cannot be faulted for following the trail of crime created by the defendants themselves. Doing so did not violate the necessity requirement.

**Law Relating to Necessity**

The law in the Ninth Circuit is that a court, in determining whether the government has shown necessity for a wiretap, must evaluate the showing in relation to the goals of the overall investigation. If normal investigative means cannot reveal the <u>entire scope</u> of the trafficking enterprise, including sources, customers, and details of operation, necessity for wiretapping has been demonstrated. <u>United States v. Torres</u>, 908 F.2d 1417, 1422 (9th Cir. 1990); <u>United States v. Carneiro</u>, 861 F.2d 1171, 1178 (9th Cir. 1988); <u>United States v. Bailey</u>, 607 F.2d 237, 242 (9th Cir. 1979). So, when normal investigative procedures have been successful in developing evidence against only some of the key members of the targeted conspiracy, necessity for a wiretap still exists where the objective of the investigation is to discover the full scope of the illegal enterprise. <u>United States v. Echavarria-Olarte</u>, 904 F.2d 1391, 1396 (9th Cir. 1990); <u>Bailey</u>, 607 F.2d at 242; <u>United States v. Sandoval</u>, 550 F.2d 427, 430 (9th

Cir. 1976).

In Sandoval, police officers used no less than five informants to infiltrate defendant Sandoval's organization and, on two occasions, purchase heroin directly from Sandoval.  Notwithstanding this success, the police obtained approval to tap the telephone at Sandoval's residence.  The district court, at the suppression hearing, ruled that the wiretaps were illegal, finding that "normal investigative techniques had in fact been successful . . . in obtaining evidence sufficient to convict Sandoval." Sandoval, 550 F.2d at 429.  On appeal, the Ninth Circuit reversed, finding that "the district court took a narrow and restrictive perspective of the scope and objectives of the investigation into Sandoval's organization." Id. at 430.  The Ninth Circuit's reasoning is worth quoting at length:

> Assuming arguendo that the police officers did in fact have evidence sufficient to apprehend and convict both Julian Sandoval and his wife, the affidavit, when read in a practical and common sense fashion . . . leads us to the conclusion that the objective of the investigation was much broader than the mere apprehension of Sandoval and his wife.  The affidavit discloses that the law enforcement officials were just as concerned in apprehending all of Sandoval's numerous "satellites" that made up his distribution scheme.  Additionally, it is apparent that the officers involved wanted to find the storage locations and recover the illegal heroin, the actual possession of which Julian Sandoval had insulated himself from [with] his elaborate machinations.  Requiring the officers to halt their investigation when they obtained evidence to prosecute only Julian Sandoval and his wife would have frustrated this objective . . . .
> Appellees' fears of unlimited use of electronic surveillance simply by

the submission of an affidavit that states "we think there are others and want to get them all" are not well founded.

Id. at 430-31.

In United States v. McGuire, 307 F.3d 1192, 1197-98 (9th Cir. 2002), the Ninth Circuit recognized that an investigation of a criminal organization, rather than an individual, affects the assessment of whether the necessity requirement has been met. "The law has long recognized that conspiracies pose a greater threat to society than individual action toward the same end." The McGuire court also stated that:

> Conspiracies pose other special dangers. Unlike individual criminal action, which comes to an end upon the capture of the criminal, collective criminal action has a life of its own. Like the Hydra of Greek mythology, the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed. For even if some or many conspirators are imprisoned, others may remain at large, free to recruit others eager to break the law and to pursue the conspiracy's illegal ends. Reflecting this concern, we have "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators." Because the government has a duty to extirpate conspiracy beyond its duty to prevent the mere commission of specific substantive offenses, we conclude that the government is entitled to more leeway in its investigative methods when it pursues a conspiracy.

McGuire, 307 F.3d at 1197-98 (internal citations and footnotes omitted).

33

In addition, the Ninth Circuit in McGuire reaffirmed its holding in United States v. Brone, 792 F.2d 1504 (9th Cir. 1986), that a wiretap:

> [C]an be necessary if it gives the government the ability to "develop an effective case." 792 F.2d at 1506. By "an effective case" we meant evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment. . . .The government's possession of evidence sufficient to indict some conspirators does not bar it from seeking evidence against others.

McGuire, 307 F.3d at 1198.

In United States v. Canales Gomez, 358 F.3d 1221, 1224 (9th Cir. 2004), the Ninth Circuit reaffirmed these principles. In Canales Gomez the court described the goals of the wiretap investigation in that case, which were almost exactly the same as the investigative goals in this case. "Specifically, the investigation [in Canales Gomez] sought to reveal the key personnel of the narcotic trafficking conspiracy, the identity of the main customers of the identified conspiracy, the stash locations where cocaine was stored prior to distribution, and the management and disposition of financial proceeds generated by the organization's cocaine trafficking." Canales Gomez, 358 F.3d at 1224. Approving the propriety of these goals, the Ninth Circuit stated: "[t]hough traditional methods had unearthed some preliminary information regarding these matters, without the wiretaps the investigators could not penetrate the inner

34

workings of the drug conspiracy or obtain information about the extended

organization, such as other members, couriers, buyers and supplier." Canales

Gomez, 358 F.3d at 1224-25. (citations and internal quotations omitted).

As it relates to the use of informants, "[t]he government need not show that

informants would be useless in order to secure a court-authorized wiretap."

Canales Gomez, 358 F.3d at 1226 (citation omitted).   For instance, in Canales

Gomez, the Ninth Circuit held that the availability of three confidential informants

did not obviate necessity, in part because "these informants had been denied

access to suppliers and customers and were unaware of relevant trafficking

locations or the scope of the full conspiracy." Id. at 1225.

In United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000), this circuit

held that the availability of an informant did not negate necessity because the

informant "was able to buy drugs from [the defendant], but he was unable to

penetrate the [defendant's] organization." So, the government's access to an

informant, even a very helpful informant, will not obviate the need for a wiretap.

Id. Several other cases in this circuit reiterate this rule.  In United States v.

Fernandez, 388 F.3d 1199, 1236 (9th Cir.  2004), this circuit held that the presence

of two informants did not dissipate the necessity element required for the use of a

wiretap.   Similarly, in United States v. Shryock, 342 F.3d 948, 976 (9th Cir.

35

2003), this circuit held that the district court did not abuse its discretion in finding necessity for a wiretap despite the fact that seven cooperating individuals had provided a "wealth of information and evidence" because even seven informants "could not possibly reveal the full nature and extent of the enterprise...."

In addition, the Ninth Circuit has also expressly recognized that because informants are generally viewed by jurors as having suspect credibility, the mere fact that certain investigative goals can be achieved with an informant does not obviate necessity. For example, when the <u>Canales Gomez</u> court reversed District Judge Takasugi's grant of a wiretap suppression motion, the court stated:

> We have stressed repeatedly that informants as a class, although indispensable to law enforcement, are oftentimes untrustworthy. . . . Indeed, juries in federal cases are routinely instructed that the testimony of witnesses receiving anything from the government in return for the witness's cooperation must be examined "with greater caution than that of other witnesses." . . . Here, the government is to be commended for its interest in wiretap evidence, which, compared to the word of an informant either in the field or in court, is the gold standard when it comes to trustworthy evidence. The truth-seeking function of our courts is greatly enhanced when the evidence used is not tainted by its immediate informant source and has been cleansed of the baggage that always comes with them. Moreover, wiretap evidence out of the mouths of defendants is valuable corroboration of informant testimony. Such evidence serves also to ensure that what investigators are being told by informants is accurate, a very valuable function that guards against the indictment of the innocent. . . . <u>Thus, we conclude that a reasoned review of a wiretap request must take into account the added difficulty, expense, and danger of using informants</u> [as the primary means of proving a case]. . . .

36

Canales Gomez, 358 F.3d at 1226-27 (citations omitted and emphasis added). See also, McGuire, 307 F.3d at 1199 ("Not only common sense but also our precedent confirms that the existence of informants and undercover agents does not preclude a necessity finding.").

In Bennett, 219 F.3d at 1120-22, this circuit also recognized that necessity continues to exist even when the government was successful in introducing an undercover officer into the organization.  The Bennett court concluded that because an undercover officer was not able to obtain information on the target's drug suppliers and major customers, necessity survived past the introduction of the undercover agent.  This circuit came to the same conclusion in Brone, 792 F.2d at 1505, when it held that necessity continued to exist despite the fact that an undercover agent succeeded in making several purchases of drugs directly from the main target of the investigation because the undercover agent had not been able to identify the suppliers of the drugs and that was one of the goals of the investigation.

These holdings make clear that the availability of informants or undercover agents does not mean that a wiretap is not necessary.  Common sense and Ninth Circuit precedent dictate that in order to effectively investigate and prosecute large-scale criminal conspiracies, the government often needs to use wiretap

37

evidence.  Considering that in the instant case the government did not have informants or an undercover agent with access to Galindo, the government is far from having over-extended its reach on the issue of necessity.

As it relates to surveillance issues, this circuit has consistently observed that the inherent limitations of physical surveillance rarely allow for the possibility of surveillance to negate a showing of necessity.  <u>United States v. Brown</u>, 761 F.2d 1272, 1276 (9th Cir. 1985) ("Physical surveillance had been employed, but had failed to provide conclusive evidence"); <u>United States v. Kail</u>, 612 F.2d 443, 447 (9th Cir. 1979) ("surveillance was generally unsuccessful in fully establishing the elements of the offense" in gambling case).  In <u>United States v. Staves</u>, 383 F.3d 977, 982 (9th Cir. 2004), this circuit held that necessity for a wiretap existed despite the surveillance that had been conducted to date "because the organization used sophisticated counter-surveillance strategies[.]"

## **The Bitter End**

Ninth Circuit precedent does not require that the government pursue every traditional investigative lead to the bitter end before applying for a wiretap.  "Courts are required to interpret the necessity requirement in a practical and common sense fashion.  Although a wiretap should not be used routinely as the

first step in a criminal investigation, it need not be the last resort." United States

v. Smith, 893 F.2d 1573, 1582 (9th Cir. 1990) (emphasis added).  "[L]aw

enforcement officials need not exhaust every conceivable alternative before

obtaining a wiretap." Fernandez, 388 F.3d 1235-36 (quotation omitted).  "What is

required is a showing that in the particular investigation normal investigative

techniques employing a normal amount of resources have failed to make the case

within a reasonable period of time." United States v. Spagnuolo, 549 F.2d 705,

710 (9th Cir. 1977).  This circuit perhaps said it most clearly in the Bennett case:

"[w]e have consistently held that the wiretap statute does not mandate the

indiscriminate pursuit to the bitter end of every non-electronic device as to every

telephone and principal in question to a point where the investigation becomes

redundant or impractical or the subjects may be alerted and the entire investigation

aborted by unreasonable insistence upon forlorn hope." Bennett, 219 F.3d at 1122

(emphasis added) (citing United States v. Baker, 589 F.2d 1008, 1013 (9th Cir.

1979)).  See also United States v. Commito, 918 F.2d 95, 98-99 (9th Cir. 1990) (" .

. . the existence of a potentially productive unused method [of investigation] is not

fatal in this necessity determination. . . . "); United States v. Carneiro, 861 F.2d

1171, 1178 (9th Cir. 1988) ("The fact that the DEA could have taken different or

some additional steps in its investigation does not demonstrate that the district

1   court abused its discretion in upholding the wiretap order").

2

3       Defendant has failed to establish that Judge Schiavelli abused his discretion

4   when he authorized the wiretaps in this case.  For that reason, Defendant's motion

5   should be denied.

6

7                                    **III.**

8

9                              **GOOD FAITH**

10      Even if this court were to conclude that Judge Schiavelli abused his

11
12   discretion when he authorized the wiretaps in this case, the evidence obtained

13   from the wiretaps should not be suppressed because the agents acted in good faith.

14
15   All of the wiretap interceptions in this case were authorized in writing by a United

16   States District Court Judge.  In United States v. Leon, 468 U.S. 897 (1984), the

17
18   Supreme Court adopted the "good faith" doctrine, which permits law enforcement

19   officers to rely on the facial validity of search warrants.  Suppression of evidence

20   is not an appropriate remedy when a search was based upon an apparently valid

21
22   warrant which was later determined to be flawed as long as the executing officer

23   had a reasonable basis for relying on the warrant's validity.  Id. at 923.  Cf. United

24
25   States v. Butz, 982 F.2d 1378, 1383 (9th Cir. 1993) (no deterrent effect in

26   suppressing evidence from a state wiretap which was based, in part, upon

27

28                                      40

information obtained by state officers in unknowing violation of state pen register law).

While an affidavit that is patently deficient cannot support the application of the good faith exception, the test for whether the exception may apply is whether the affidavit was sufficient to "create disagreement among thoughtful and competent judges as to the existence of probable cause." United States v. Hove, 848 F.2d 137, 139 (9th Cir. 1988) (citing Leon).  Here, a district court judge agreed with the sufficiency of the showings made in the wiretap affidavits.  As such, the affidavits were at least sufficient to create disagreement among thoughtful and competent judges as to the existence of the necessity element.  Moreover, the policies behind the good faith exception to the exclusionary rule apply equally to wiretap orders.[10]  If the agent relied on the orders in good faith, it would create no deterrent effect to suppress valuable evidence of guilt and, in essence, reward a guilty defendant.  Thus, the rule of Leon should apply to

_____

[10]   The Eight Circuit and Eleventh Circuit have each expressly held that the good faith exception applies to wiretap orders. See United States v. Moore, 41 F.3d 370, 376-77 (8th Cir. 1994); United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988).   The Ninth Circuit has reached a similar result in a case in which pen register data that was obtained in violation of state law was used to support a wiretap.  In U.S. v. Butz, 982 F.2d 1378 (9th Cir. 1993), the court relied on the good faith exception to avoid suppression of wiretap evidence.  See also: U.S. v. Tomero, 462 F. Supp.2d 565, 572 (S.D.N.Y. 2006).

wiretaps and preclude suppression even if this court currently believes that the necessity element was lacking, because the agent was entitled to rely in good faith on the orders of Judge Schiavelli when he authorized the wiretaps.

## IV.

## LOPEZ'S JOINDER

Defendant Lopez has filed a motion joining Defendant Greer's motion for suppression of evidence seized as a result of the wiretap. "[A] defendant may move to suppress the fruits of a wire-tap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises." United States v. King, 478 F.2d 494, 506 (9th Cir. 1973) (citing Alderman v. United States, 394 U.S. 165, 176 (1969)). Defendant was not intercepted over the wiretap. Consequently, Defendant is not an aggrieved person, as defined by 18 U.S.C. § 2510 (11), and he does not have standing to benefit from an order suppressing the wiretap.

42

# V.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to suppress wiretapinterceptions should be denied in its entirety without an evidentiary hearing.

Dated:  May 2, 2008          Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

MICHAEL J. STERN
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

43

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . .   3

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

II.   CHALLENGE TO THE WIRETAP . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

      Attorney General Authorization . . . . . . . . . . . . . . . . . . . . . . . . . .   5

      15 Day Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

      Necessity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

      Prior Interceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

      Confidential Informants . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

      Physical Surveillance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

      Financial Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

      Search Warrants, Interviews, Grand Jury, Immunity,
      Trash Searches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

      Pen Registers, Trap and Trace Devices, Toll Analysis,
      Subscriber Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

i

TABLE OF CONTENTS (Cont'd)

Scope of the Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

Law Relating to Necessity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

The Bitter End . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

III.   GOOD FAITH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

IV.   LOPEZ'S JOINDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

# TABLE OF AUTHORITIES

FEDERAL CASES                                                   PAGE(S)

U.S. v. Anderson,
    39 F.3d 331 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. v. Tomero,
    462 F. Supp.2d 565, 572 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Bailey,
    607 F.2d 237, 242 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Bennett,
    219 F.3d 1117, 1121 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Blackmon,
    273 F.3d 1204 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

United States v. Brone,
    792 F.2d 1504 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37

United States v. Brown,
    761 F.2d 1272, 1276 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Butz,
    982 F.2d 1378, 1383 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 40, 41

TABLE OF AUTHORITIES (Cont'd)

FEDERAL CASES

United States v. Canales Gomez,
   358 F.3d 1221, 1225 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Carneiro,
   861 F.2d 1171, 1178 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

United States v. Commito,
   918 F.2d 95, 98-99 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Echavarria-Olarte,
   904 F.2d 1391, 1396 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Edmond,
   718 F. Supp. 988, 991 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Fernandez,
   388 F.3d 1199, 1237 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 24, 35

United States v. Hove,
   848 F.2d 137, 139 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Iannelli,
   477 F.2d 999, 1002 (3rd Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

iv

TABLE OF AUTHORITIES (Cont'd)

FEDERAL CASES

United States v. Kail,
     612 F.2d 443, 447 (9th Cir. 1979) ........................... 38

United States v. Kerr,
     711 F.2d 149, 151 (10th Cir.1983) ........................... 7

United States v. King,
     478 F.2d 494, 506 (9th Cir. 1973) ........................... 42

United States v. Lawson,
     780 F.2d 535, 539 (6th Cir. 1985) ........................... 7

United States v. Leon,
     468 U.S. 897 (1984) ........................... 40

United States v. Malekzadeh,
     855 F.2d 1492, 1497 (11th Cir. 1988) ........................... 41

United States v. McGuire,
     307 F.3d 1192, 1197 (9th Cir. 2002) ........................... passim

United States v. Messersmith,
     692 F.2d 1315, 1316-17 (11th Cir. 1982) ........................... 7

TABLE OF AUTHORITIES (Cont'd)

FEDERAL CASES

United States v. Moore,
41 F.3d 370, 376-77 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Reyna,
218 F.3d 1108 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Sandoval,
550 F.2d 427, 430 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-33

United States v. Shryock,
342 F.3d 948, 976 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Smith,
893 F.2d 1573, 1582 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Spagnuolo,
549 F.2d 705, 710 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Staves,
383 F.3d 977, 982 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Terry,
702 F.2d 299, 311 (2d Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

# TABLE OF AUTHORITIES (Cont'd)

FEDERAL CASES

United States v. Todisco,
    667 F.2d 255, 259 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

United States v. Torres,
    908 F.2d 1417, 1422 (9th Cir. 1990)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

United States v. Wyder,
    674 F.2d 224, 226-27 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

FEDERAL STATUTES

18 U.S.C. § 2510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

18 U.S.C. § 2516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 9

18 U.S.C. § 2518(1)(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

18 U.S.C. § 2518(3)(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

18 U.S.C. § 2518(3)(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

18 U.S.C. §2518(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10